IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:24-cr-98-1 |
| | ) | |
| v. | ) | Sentencing Date: November 13, 2024 |
| | ) | |
| DEANDRE S. MERRITT, | ) | Hon. Anthony J. Trenga |
| a/k/a "Dre," | ) | |
| a/k/a "Scam Likely," | ) | |
| a/k/a "John Adams," | ) | |
| *Defendant*. | ) | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

"Scamming" was not just a way for the defendant, Deandre S. Merritt ("Merritt" or the "defendant") to make money, it was his identity. Quite literally. Merritt used the moniker "Scam Likely," as his screenname when planning his various fraud schemes. As his alter ego would suggest, the defendant was a prolific fraudster who participated in multiple different schemes that victimized individuals and used their stolen identification information to enrich himself. The indictment charges the defendant with executing three different fraud schemes. The defendant was more than a mere participant in these three fraud schemes – he was intricately involved in each scheme and directed the actions of at least 15 other conspirators. To make matters worse, the defendant defrauded various government pandemic relief programs during the backdrop of the COVID-19 pandemic, an unprecedented time of financial hardship, turmoil, and suffering.

The United States of America in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, Guidelines Manual ("Guidelines" or "U.S.S.G."), files this Position of the United States with Respect to Sentencing of the defendant. The Probation Officer calculated the Sentencing Guidelines Total Offense Level of 27, which corresponds to an advisory Guidelines range of 87 to 108 months since the defendant is in Criminal History Category III. Within the plea

agreement, the parties agreed that the defendant should face a 14-level loss enhancement instead of the 16-level loss enhancement assigned by the Probation Officer. The United States contends that the defendant should face a Total Offense Level of 25 and Guidelines range of 70 to 87 months.

Thus, based on the factors set forth in 18 U.S.C. § 3553(a), the United States requests that this Court impose a sentence of 70 months, three years of supervised release, enter the forfeiture order for $244,450, as detailed in the draft consent forfeiture order, Ex. A, and order restitution in the amount of $1,102,721.99, as detailed in the draft restitution order, Ex. B.

## I.       PROCEDURAL HISTORY

On May 8, 2024, an indictment was returned against the defendant, Silvester E. Hawkins, II, ("Hawkins") and Trevon Thompson ("Thompson"). Dkt. 88 (hereinafter PSR) at ¶ 1. The three defendants were charged with multiple counts related to an unemployment fraud scheme. *Id* at ¶¶ 1, 19. The defendant and Thompson were also charged with conspiracy to commit fraud in connection with identification documents, and Hawkins and the defendant were charged with a bank fraud scheme. *Id.* at ¶¶ 1, 19-20. The bank fraud scheme Hawkins and Merritt were charged with is the same one for which Odyssey Wilhoit ("Odyssey") was charged and pleaded guilty. *Id.* at ¶¶ 19, 23-34. The unemployment fraud scheme overlaps with the one Odyssey operated. *Id.* at ¶ 20. Specifically, Odyssey applied for benefits in Virginia, whereas Merritt, Thompson, and Hawkins applied for benefits in California using some of the same names and PII that Odyssey used in the Virginia claims. *Id*. Merritt, Thompson, and Hawkins also applied for unemployment benefits in others' names that were not connected to Odyssey and made claims in their own names.

The defendant, Merritt, was charged in eight counts of the indictment. He ultimately pleaded guilty to Count One (Conspiracy to Commit Bank Fraud in violation of 18 U.S.C. § 1349)

and Count Seven (Conspiracy to Commit Wire and Bank Fraud in violation of 18 U.S.C. § 1349) on August 27, 2024. PSR at ¶ 2. His Statement of Facts detailed his involvement in the charged conduct. *Id.* at ¶¶ 26-41. The defendant is set to be sentenced on November 13, 2024.

In October 2022, Odyssey was charged with an unemployment fraud scheme for which she conspired largely with her family members. *See United States v. Eric Wilhoit, et al.*, 1:22-cr-191-AJT, Dkt. 65.   As to Odyssey's bank fraud scheme, her family members had lesser involvement. Odyssey was found to be the leader organizer of the bank fraud scheme and was sentenced on April 26, 2023 for both schemes to a term of imprisonment of 75 months. *Id.* Dkt. 147, 152; PSR at ¶ 21. Dejhaun Wilhoit[1] and Jeremiah Wilhoit were each sentenced to a 66-month term of imprisonment for their roles in the unemployment fraud scheme. *Id.*, Dkt. 178, 180. Eric Wilhoit was sentenced to 84 months for his leadership role in the unemployment fraud scheme. *Id.*, Dkt. 195. Jaleai Morrison, who participated in Odyssey's bank fraud scheme by providing both stolen mail and PII, was sentenced to a term of imprisonment of 24 months. *See United States v. Jaleai Morrison*, 1:22-cr-177-AJT, Dkt. 52. Jason Banks ("Banks"), who also participated in Odyssey's bank fraud scheme, predominantly as a recruiter, was sentenced to 18 months. *See United States v. Jason Banks*, 1:24-cr-91-AJT, Dkt. 19. Thompson, one of Merritt's codefendants who was involved in the unemployment fraud scheme, the conspiracy to commit fraud in connection with identification documents, and his own bank fraud scheme was sentenced to 33 months. Dkt. 73. Hawkins, who was a minor participant involved in both the bank fraud scheme and unemployment fraud scheme, was sentenced to 15 months of incarceration. Dkt. 86.

---

[1] Dejhaun Wilhoit also pleaded guilty to a Felon in Possession charge and sentenced for that offense as well. *See* 1:22-cr-191-AJT, Dkt. 178.

## II.     FACTUAL BACKGROUND

The Indictment charged the defendant with at least three different fraud schemes. PSR at ¶¶ 1, 19-20, 23-34, 35-42, and 46-59. The first scheme was the bank fraud conspiracy which involved cashing counterfeit checks at different bank branches. *Id.* at ¶¶ 19-20, 23-34. Merritt directed at least 15 individuals, including Hawkins and Buckingham, actions within the conspiracy. *Id.* at ¶ 60. Specifically, Merritt obtained a U.S. Postal Service ("USPS") arrow key, which is a universal key used by mail carriers and collectors that can unlock various USPS collection boxes. *Id.* at ¶ 26. Members of the conspiracy would steal the mail and Merritt would then alter the stolen checks to create the new counterfeit checks that his coconspirators would cash. *Id.* at ¶ 28, 34. He would send Buckingham, a bank employee, pictures of the counterfeit checks that he and others created and so that she would verify that these checks could be cashed at the banks. *United States v. Melody Buckingham,* 1:24-cr-134-AJT, Dkt. 16 at ¶¶ 34-35.

Merritt would also direct and coordinate when the coconspirators would deposit the counterfeit checks at the bank branches. *Id.* at ¶ 37. Specifically, Merritt would drive his coconspirators, including Hawkins, to the different banks and tell the coconspirators which bank employee to approach with the counterfeit checks. PSR at ¶ 32. Hawkins and other coconspirators would then cash the counterfeit checks and return the illegal proceeds to Merritt. *Id.* at ¶ 34. Merritt provided Hawkins with drugs and a place to live in exchange for Hawkins' role in the offense. Dkt. 77 at ¶ 28.

Merritt also regularly obtained illegitimate identification documents to perpetuate various frauds in 2021. PSR at ¶¶ 35-42. Specifically, Thompson and Merritt worked together to obtained both driver's licenses and passports that were held in others' names, but pictured Thompson. *Id.*

at ¶¶ 35, 37, 39. In committing the scheme, Thompson would send the PII of individuals, including their addresses and dates of birth to Merritt. *Id.* at ¶ 36. Merritt would in turn contact an individual who would then create the illegitimate documents. *Id.* at ¶ 37. The identification documents were used to perpetuate other schemes, such as opening bank accounts and applying for loans and credit lines. *Id.* at ¶¶ 38-39, 36.  For instance, Thompson opened an account using one such identification document in August 2021. *Id.* at ¶ 34. This bank account was used to receive and transfer fraud proceeds. *Id.* at ¶ 39. Furthermore, Merritt, Thompson and Hawkins applied for a Paycheck Protection Program ("PPP") loan in the name of C.A. *Id.* at ¶ 40. Thompson's picture was used on an illegitimate driver's license bearing C.A.'s name. *Id.* Hawkins was found in possession of the Green Dot card, with C.A.'s name, which contained the PPP loan fraud proceeds. *Id.* at ¶ 40. And Merritt spent a portion of the funds for $1,000 worth of "eternity roses." *Id.* at ¶ 40.

Merritt was also involved in another scheme that involved the creation of illegitimate identification documents to perpetuate an unemployment fraud scheme. *Id.* at ¶¶ 20, 46-59. Specifically, Merritt, Thompson, and Hawkins conspired together to obtain fraudulent unemployment benefits, many of which were from California. *Id.* at ¶¶ 20, 26-27. The defendant managed Hawkins' and Thompson's actions within the conspiracy. PSR at ¶ 60. Specifically, the defendant with the assistance of his coconspirators repeatedly submitted false and misleading unemployment applications to various states' workforce agencies, including the states of California, Indiana, Maryland, and Pennsylvania, using the personal identifying information of others, including identity theft victims. *Id.* at ¶¶ 8, 49-54.

As background, for some of the claims, California required that the applicant prove their identity through a third-party company, Company 1. *Id.* at ¶¶ 45, 55. Company 1 required that the

applicant upload identification documents and then provide real-time photographs or participate in live video sessions. *Id.* at ¶¶ 55-56. The conspirators submitted multiple applicants' documents included Hawkins' or Thompson's picture on false identification documents. *Id*. Additionally, with the defendant's assistance, Hawkins and Thompson provided real-time photographs to Company 1 and participated in live video sessions claiming to be the applicants. *Id.* at ¶¶ 55-56. Merritt and other coconspirators would travel to California to collect the prepaid debit cards which contained the unemployment benefits (the "EDD prepaid debit cards"). *Id.* at ¶ 57. Other California based coconspirators would mail Merritt the EDD prepaid debit cards as well. *Id.* Merritt used the EDD prepaid debit cards to enrich himself. He withdrew funds from ATMs with the EDD prepaid debit cards, linked seven of EDD prepaid debit cards to one of his Cash App accounts and used the EDD prepaid debit card to make luxury purchases at Tyson's Corner. *Id.* at ¶ 59. Specifically, he used an EDD prepaid debit card in R.F.'s name to make a $300 purchase from Gucci and a nearly $700 purchase from Neiman Marcus. *Id.* The defendant received a sizable profit from the illegal schemes, as he agreed to forfeit at least $244,450 via a money judgment in the consent order of forfeiture. *Id.* at ¶ 11.

In addition to these schemes, Merritt was convicted of at least 8 prior theft or fraud related convictions during the past decade. PSR at ¶¶ 91-96. He also has two other past theft or fraud related arrests. *Id.* at ¶¶ 104, 107. One of these arrests stemmed from the August 5, 2021, traffic stop that is related to the charged offenses. *Id.* at ¶ 107.

Also relevant to the Court's consideration is the defendant's pending charges in other jurisdictions. Merritt is currently facing charges in Anne Arundel County for leaving a loaded handgun in a vehicle in October 2023. PSR at ¶ 103. During the investigation law enforcement

6

discovered that the vehicle in question was stolen. Within the vehicle, officers discovered three fraudulent passport cards, three fraudulent capital cards, a fraudulent Maryland car title, and a loaded handgun. PSR at ¶ 103. Notably, the investigation appears to be related to a domestic violence call in which the caller stated that the defendant broke into her apartment and threatened to shoot her with a gun. *Id.*

While awaiting the disposition of those charges, the defendant was also arrested in Granville County, North Carolina in February 2024, on 14 charges of identity theft, possession of heroin, possession of drug paraphernalia, possession or manufacturing of a fraudulent identification and several traffic offenses. *Id.* at ¶¶ 103-104. The vehicle in which the defendant was stopped in held two other passengers, who were admitted heroin users. *Id.* at ¶ 104. One passenger spoke to law enforcement and stated that the driver (the defendant) picked them up, gave them a place to stay at a hotel, bought them new clothes and gave them each an identity to memorize so that they could go to the bank and withdraw money. *Id.* Within the vehicle, North Carolina State Troopers also found an illegitimate passport, driver's license, blank cards, and U.S. seals to make false passports in the vehicle. *Id.* This case's indictment also alleged that the defendant was found in possession of identifying information for the purpose of making financial transactions, cards, and mirror tape, as well as heroin and a pipe. *Id.*

In addition to the defendant's numerous fraud related arrests and convictions, Hawkins reported that the defendant kept numerous instrumentalities and tools for fraud schemes in his residence. Specifically, Hawkins stated that Merritt kept large quantities of mail, bank cards, guns, and 15-20 cells phones at his residence during the fraud schemes. *Id.* at ¶ 20.

## III.    THE  APPROPRIATE  GUIDELINE  RANGE

As this Court is aware, following the Supreme Court's decision in *United States v. Booker*, the Sentencing Guidelines are now advisory. 543 U.S. 220, 264 (2005). "In the wake of *Booker* . . . the discretion of sentencing court is no longer bound by the range prescribed by the guidelines. Nevertheless, a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" *United States v. Hughes,* 401 F.3d 540, 546 (4th Cir. 2005) (quoting *Booker,* 543 U.S. at 264). In fact, the Fourth Circuit has noted that "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *United States v. Hughes,* 401 F.3d 540, 546 (4th Cir. 2005). Thus, "sentencing courts are not left with unguided and unbounded sentencing discretion." *United States v. Green,* 436 F.3d 449, 455 (4th Cir. 2006).

The PSR calculated a Guidelines Total Offense Level of 27 for Merritt, which results in an advisory Guidelines range of 87 to 108 months of incarceration. The Total Offense Level of 27 results from the following:

**Base Offense Level** (U.S.S.G. §§ 2X1.1(a) and 2B1.1(a)(1))                          **7**

**Adjustments**

  Loss between $1,500,000 and $3,500,000 (U.S.S.G. § 2B1.1(b)(1)(I))            +16

  Involved 10 or more victims (U.S.S.G. § 2B1.1(b)(2)(A)(i))                          +2

  Involved the trafficking of any counterfeit access device, or unauthorized      +2
  transfer or use of any means of identification unlawfully to obtain any other means of
  identification, or the possession of 5 or more means of identification that unlawfully were
  produced from another means of identification ((U.S.S.G. § 2B1.1(b)(11)(B)(i), (C)(i)-(ii))

  Adjustment for a manager/supervisor role in the offense (U.S.S.G. § 3B1.1(b))      +3

8

| | |
|---|---|
| Acceptance of Responsibility[2] (U.S.S.G. § 3E1.1(a)) | <u>-3</u> |
| **Total Offense Conduct** | **27** |

The United States contends that the Court should apply the 14-level loss enhancement instead of the 16-level loss enhancement. The Probation Officer correctly calculated a loss of $2,233,276.17,[3] which would result in an additional two points because the loss is over $1,500,000. U.S.S.G. 2B1.1(b)(1)(I). *Id.* at ¶ 78. However, the government agreed to a 14-level enhancement for an actual loss between $550,000 and $1,500,000 in the plea agreement. PSR at ¶ 4. Consistent with its obligation in the plea agreement, the government advocates for the Court to apply the 14-level increase for the loss enhancement instead of the 16-level increase. Otherwise, the United States agrees with all other calculations by the Probation Officer. If the Court was to apply a 14-level loss enhancement, the defendant would face a Total Offense level of 25 with a Guidelines range of 70-87 months.

## IV.   THE FACTORS SET FORTH IN SECTION 3553(A) AND RECOMMENDED SENTENCE

After calculating the appropriate Guidelines range, "the court must 'determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006) (quoting *Green*, 436 F.3d at 455). Those factors include the nature of the

---

[2] As noted here, the PSR includes a three-level decrease for acceptance of responsibility. The United States agrees that the defendant qualifies, pursuant to U.S.S.G. § 3E1.1(a), for a two-level reduction. In addition, the defendant timely notified the United States of his intention to plead guilty, thus permitting the United States to avoid preparing for trial and to allocate its resources more efficiently. Accordingly, the United States hereby moves, pursuant to § 3E1.1(b), to decrease the defendant's offense level by one additional level.

[3] The Probation Officer's calculation included the loss calculated by the parties as well as the intended loss of $1,706,134.79 from the bank fraud scheme.

offenses, the characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, afford deterrence, protect the public, and provide the defendant with needed educational or other training. 18 U.S.C. § 3553(a). The Court need not weigh the factors equally but must consider each of them. *United States v. Fowler,* 948 F.3d 663, 674 (4th Cir. 2020).

The nature and circumstances of the defendant's offenses calls for a significant term of imprisonment. As detailed in the Statement of Facts, the defendant participated in three fraud schemes that involved identity theft. Notably,  Merritt was the only defendant in the above-captioned case who was charged in each of the three separate schemes charged by the indictment. Merritt's status as the link between the other defendants in the conspiracies and schemes charged points to not only his prolific criminal activities but also to the fact that he was deeply involved in the planning and organizing of the different schemes. Moreover, at least one fraud scheme continued for a prolonged time. Specifically, Counts Two and Four of the indictment were based on a bank fraud scheme that lasted from May 2020 through August 5, 2021. Dkt. 1 at 12.

Furthermore, one of these schemes targeted COVID-19 relief programs during the pandemic, a time of true economic uncertainty. The fear felt at the time is hard to remember now – there were concerns about the country falling into an economic depression during the first few months of the pandemic. Millions of Americans lost their jobs seemingly overnight. 23.1 million Americans were unemployed in April 2020.[4] The U.S. real gross domestic product (GDP) "fell by 8.9 percent in the second quarter of 2020 … the largest single-quarter contraction in more than 70

---

[4]"TED: Economics Daily," U.S. Bureau of Labor Statistics, available at
https://www.bls.gov/opub/ted/2020/unemployment-rate-rises-to-record-high-14-point-7-percent-in-april-2020.htm (last visited September 1 2023)

years."[5] Congress appropriated billions of dollars to create or supplement government relief programs and ease some of the economic hardship and uncertainty. Because this assistance was desperately needed by unemployed Americans for their economic survival, the government made a policy decision to deliver the relief on an unprecedented scale as quickly as possible. However, the defendant chose to exploit the inherent vulnerabilities of this massive relief effort and defraud *five* different COVID-19 relief programs including the unemployment benefit programs of Indiana, California, Maryland, and Pennsylvania as well as the Small Business' Paycheck Protection Program. Defendant also exacerbated the harm he caused by recruiting additional people to join his schemes to defraud these relief programs.

The sheer number of schemes, hubris of the schemes, the extended period for which the frauds occurred, and Merritt's managerial role within the offenses justify the government's request for a term of imprisonment of 70 months to reflect the nature and circumstances of the offense as well as the seriousness of the defendant's crimes.

"Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks and citation omitted); *United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2012) ("[G]eneral deterrence is an important factor in white-collar cases, where the motivation is greed."). Absent a serious term of imprisonment, general deterrence — "the effort to discourage similar wrongdoing

---

[5] "The U.S. Economy and the Global Pandemic, Chapter 3," the White House (April 26, 2022, 4:00 p.m.) available at whitehouse.gov/wp-content/uploads/2022/04/Chapter-3-new.pdf (last visited September 1, 2023)

by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976). As this court is well aware, identity theft and bank fraud have plagued the greater Washington D.C. area due in large part to mail theft.[6] Moreover, identity theft is a persistent problem in America. An AARP report found that approximately 15 million American adults lost around $43 billion to identity fraud in 2023.[7] General deterrence is critical in cases involving stolen mail, bank fraud, and identity theft.

Specific deterrence is necessary here as well. Despite being only 29 years-old, the defendant already possesses an impressive criminal record littered with fraud convictions. The defendant's criminal history spans a decade. He received his first convictions in 2014 and was arrested again earlier this year for 14 counts of identity theft (alongside other offenses) in North Carolina. In total, it appears that the defendant has convictions arising out of seven different incidents, including five fraud related incidents. Notably, many of the defendants' other arrests and convictions are not related to the specific criminal conduct alleged in this indictment.[8]

The similarities in the schemes underlying the defendant's other convictions or arrests are striking. He has a pattern of obtaining stolen identification information and then using that PII to create counterfeit checks or illicit identification documents. Merritt then uses the counterfeit

---

[6] *See* https://www.washingtonpost.com/dc-md-va/2022/05/01/chevy-chase-mailbox-stolen-checks/;  https://www.washingtonpost.com/business/2023/07/05/mail-theft-postal-service/; https://www.washingtonpost.com/dc-md-va/2024/01/26/maryland-check-theft-scheme/.
[7] Christina Ianzito, *Identity Fraud Cost Americans $43 Billion in 2023*, AARP, Apr. 10, 2024, https://www.aarp.org/money/scams-fraud/info-2024/identity-fraud-report.html, last accessed October 23, 2024.
[8] The defendant's March 8, 2021 convictions (PSR at ¶ 96) and August 5, 2021 arrest (PSR at ¶ 107) are related to the fraud schemes charged in this Indictment.

checks or unlawful identification documents to enrich himself either through draining victims' bank accounts or by taking out new lines of credit in the victims' names. The defendant's repeated choices to engage in almost the exact same sort of criminal conduct shows that his prior arrests and convictions have not deterred him. Moreover, the defendant's recycled fraud schemes have been profitable. He admitted to illegally earning at least $244,450 for the conduct charged in the indictment. The combination of illegal profits and unserious sentences have ultimately distorted the risk calculation for the defendant's offenses. Instead, scamming appears to be an attractive and lucrative lifestyle for the defendant. Given this, there is a significant risk that he will continue to commit fraud and a significant sentence is needed to deter him from joining future fraud schemes.

The defendant's criminal conduct also showcases his lack of respect for the law. Specifically, the defendant's criminal history shows a pattern of continuing to commit new criminal offenses despite being under court supervision. The defendant was arrested in 2019 at Fairfax, Virginia for various fraud and identity theft related offenses in violation of Commonwealth law. The defendant's 2019 Fairfax case was not resolved until 2021. Some of the offenses charged in the indictment are alleged to have started in 2020, when the defendant was presumably under supervision of the Circuit Court of Fairfax County. Similarly, the defendant was arrested in Anne Arundel County Maryland in October 2023. Yet that arrest did not deter the defendant from continuing to commit additional crimes. Roughly four months later, in February 2024, the defendant was arrested again in North Carolina for unrelated charges, including charges of identity theft and possession of heroin. The defendant was on pretrial supervision for his Anne Arundel offenses at the time of his February arrest in North Carolina. As such, a consequential term of imprisonment of 70 months is also necessary to promote respect for the law.

The defendant's instant crimes along with his criminal history, in particular his identity theft and fraud convictions, also speak to the economic danger that he poses to the community if he is released. *See United States v. Parodi*, No. CR-08-0083 PJH, 2008 WL 683421, at *3 (N.D. Cal. Mar. 7, 2008) ("Propensity to commit crime generally may constitute a sufficient risk of danger to come within the act."). More alarming, the defendant's criminal behavior is escalating. Not only has the defendant been involved in a multitude of fraud schemes of the years, but he has recruited and directed numerous other individuals within these schemes. No longer does the defendant use his own likeness to create illegitimate identification documents as he did in 2019 (*see* PSR at ¶ 96). Instead, the defendant used people like Hawkins and Thompson to perpetuate his fraud schemes and have their faces plastered to dozens and dozens of illegitimate identification documents that were used to fraudulently open bank accounts, obtain lines of credit or unemployment benefits. *See* Dkt. 67, Exhibit 1 and Dkt. 80, Exhibit 1. Not only is the defendant attempting to avoid detection, but he is also multiplying the harmful effects of his actions because he is able to commit more fraud with the assistance of his coconspirators.

The defendant also appears to intentionally recruit vulnerable individuals that he can exploit. Hawkins admitted in his Statement of Facts that the defendant gave him drugs and a place to reside as part of his compensation for participating in the fraud schemes. Similarly, one of the homeless men who was arrested alongside Merritt in North Carolina, in connection to a bank fraud scheme that used stolen identification information, was an admitted heroin user who stated that Merritt provided him with drugs and a hotel room in exchange for the man's work in the scheme. This is also an escalation in his methods of committing fraud. A 70-month sentence of incarceration is needed to protect society from Merritt, including his repeated recruitment of

14

vulnerable individuals to participate and perpetuate his fraud schemes.

Of consideration is balancing the similar defendants' sentences to avoid disparate treatment. As this Court is undoubtedly aware, the defendants in the related cases have been sentenced to a wide range of terms of imprisonment. However, the defendant's involvement in numerous fraud schemes, his managerial role and personal profit from the schemes, as well as his criminal history call for a sentence more like Odyssey's and the other Wilhoits' sentences than to Banks' and Hawkins' sentences.

While Banks also received a sentencing enhancement for his managerial role in the bank fraud conspiracy, the defendant was much more intricately involved in the bank fraud conspiracy than Banks. Merritt had an arrow key that was used to help steal mail from the USPS collection boxes, he created counterfeit checks and recruited individuals who were integral to the conspiracy's success. Merritt managed at least 15 others in the conspiracy and he also recruited a wider variety of coconspirators. Merritt recruited Buckingham, a bank employee, as well as Hawkins, someone who cashed the counterfeit checks, whereas Banks recruited those for their bank accounts to be used. Unlike Banks, Merritt was also involved in multiple different fraud schemes. Additionally, the extensive use of fake identification documents was not a central pillar to the Banks' case, nor did Banks have an extensive criminal history. As such, Merritt is deserving of a period of incarceration well above Jason Banks.

Thompson, who was one of the defendant's coconspirators in the unemployment fraud scheme and involved in rampant identity theft alongside the defendant, was sentenced to term of imprisonment of 33 months. However, the defendant should receive a longer term of imprisonment

15

as he profited from the illegal activities more than Thompson, held a managerial role in multiple fraud schemes, and has a lengthier criminal history.

Instead, the 3553A sentencing factors in Merritt's case are more like those in Odyssey Wilhoit's case. Both Merritt and Odyssey were involved in multiple fraud schemes, served in managerial or leadership roles, and had similar Guideline calculations as the Probation Officer ultimately calculated Odyssey's Total Offense Level to be a 28 and her Criminal History as a Category III.[9] Of note Merritt's criminal history is worse than Odyssey's and Odyssey would be in a lower criminal history category under the updated Sentencing Guidelines. *See* 1:22-cr-191-AJT, Dkt. 223. As such, the United States submits that a sentence including a term of incarceration similar to Odyssey's term of 75 months is justified here.

The harm caused by the defendant extends past the money he obtained. Poignantly, one victim described the "loss of confidence and trust" in the mail system. PSR at p. 35. While this may seem like an intangible harm, it is a real harm to everyone because the less the U.S. mail is used, the more expensive it could be become for everyone. Importantly, as explained by another victim, " the complications and resources spent illustrate how vulnerable a business can be when mail is stolen." *Id.* at p. 39. Another business owner described the ordeal as a "nightmare," which ultimately resulted in the business not having access to any income, over $100,000, for a month. *Id.* at p. 37. But beyond the hassle that identity theft causes, another victim described a more existential harm. J.T., whose identity was used in the unemployment fraud scheme wrote, "A man's identity is closer tied to his reputation [sic] I've work hard to have a good reputation and

---

[9] However, Odyssey Wilhoit also received a 4-level role enhancement for being deemed the leader/organizer of a fraud, which is a larger role enhancement than the managerial 3-level enhancement that was applied to Merritt's Total Offense Level.

now I don't know who I am in other peoples [sic] eyes." PSR at p. 40. He explained that since he learned that his identity was stolen, he has been worried and "unsettled." *Id.* Specifically, he is "constantly checking [his] banking accounts and credit reports" because he is afraid "problems will arise." *Id.* This fear is real. Because sadly once one's identity is stolen, the PII can be used over and over again to commit fraud, such as opening bank accounts and applying for lines of credit. The government echoes this victim's request that the court "take into account the profound impact" this had on his life, as well as other victims' lives, when fashioning the defendant's sentence. *Id.* Due to the ease at which PII can be recycled between fraud schemes, the true amount of harm the conspirators caused these victims is unknown at this point – but it is certainly greater than the number of dollars and cents stolen from their accounts.

A significant period of incarceration will reflect the seriousness of the defendant's offense, promote respect for the law, deter future criminal conduct, protect the public from future harm and provide a just punishment.

## **CONCLUSION**

For the reasons stated, the United States respectfully requests this court to sentence Deandre Merritt to a period of incarceration of 70 months and to 3 years of supervised release. Such a sentence is reasonable and accounts for each of the factors set forth in 18 U.S.C. § 3553(a). Finally, the government will request that the Court enter the restitution and forfeiture orders.

Jessica D. Aber
United States Attorney


_____/s/_____
Kathleen Robeson
Assistant United States Attorney
Kimberly Shartar
Assistant United States Attorney

18

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 6, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of that electronic filing (NEF) to all counsel of record:

By:      _____/s/_____

Kathleen Robeson
Assistant United States Attorney
United States Attorney's Office
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: 703-299-3700
Email: kathleen.robeson@usdoj.gov